**Robert BOWEN, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION
AC SPARK PLUG DIVISION,
Defendant.**

**Civ. A. No. C76–373A.**

United States District Court,
N. D. Ohio, E. D.

March 1, 1979.

Paul A. Tscholl, John A. Tscholl, Canton, Ohio, for plaintiff.

John O'Brien, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Invoking the jurisdiction of the Court pursuant to 28 U.S.C. § 1343, plaintiff Robert Bowen initiated this class action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17, to redress alleged unlawful employment discrimination in the AC-Delco division of defendant General Motors Corporation. The complaint alleged that the defendant discriminates by:

a. Failing to recruit and hire Negroes as sales representatives.

b. Failing to transfer and promote qualified Negro employees as sales representatives because of their race.

c. Maintaining practices with respect to but not limited to job assignments and conditions of employment which unlawfully operate to deny equal opportunities to Negroes in the area of sales because of their race.

d. Maintaining policies and practices which utilize subjective standards or criteria, which operate to disparately and adversely affect Negroes because of their race.

e. Maintaining policies and practices which adversely affect Negro employees because of their race.

f. Failing and refusing to provide training for Negro employees for the positions they are placed in because of their race.

g. Engaging in employment practices and policies under which Negro employees are treated disparately, discriminated against or discharged as sales representatives because of temporary disabilities or illnesses which are not justified by business necessity.

h. Failing and refusing to take affirmative action to correct the effects of the discriminatory policies and practices complained of herein.

i. Retaliating against Negro employees for filing complaints with the State and Federal agencies to investigate the charges set forth ... [above].

By its order of December 8, 1977 the Court certified a class of:

Negro persons who are now employed or were employed by defendant as sales representatives since March 1, 1969.

The Court duly heard testimony and received exhibits on October 4, 5, 6, and 10, 1978. The following shall constitute the Court's findings of fact and conclusions of law as required by rule 52, Federal Rules of Civil Procedure.

### FACTS

Plaintiff was initially hired by defendant as an hourly worker in the AC Sparkplug division. In 1969 he was promoted into the sales force as a sales representative.[1] In 1974 a merger occurred and AC Sparkplug became AC-Delco. The basic organization of the sales force has remained the same. AC divides the country into regions, that are subdivided into zones, that are in turn subdivided into districts. Regional mana-

---

1. At the time the job title was dealer merchandiser, but the Court will use the newer title herein.

gers oversee zone managers who oversee district managers.

Sales representatives, such as Bowen, report to district managers. Sales representatives are primarily responsible to promote AC products to service station and garage owners. They explain the advantages of AC products, distribute advertising materials, and describe new promotional campaigns. If the sales representative induces the owner to carry another AC product, or if stock is running low, the sales representative takes the order and fills out an order form. The station owner retains one copy of the form, and the sales representative retains the other two. One of these he will give to the jobber (wholesaler) who will fill the order, the other will be sent to the regional office. The sales representative keeps a record of all the stations he visits, and at the end of the week he sends his daily call reports and the order forms to the regional office.

One salary level above the sales representatives are the jobber development sales managers (hereinafter JDSM). Comparable to sales representatives, JDSMs promote AC products to the jobbers in the district; they too report to the district managers.

Sales representatives and JDSMs get occasional special assignments from the district managers. A changeover must be done when AC gets a new customer; that is, the competitor's products must be removed and replaced with the AC items. Or, a jobber may request that AC personnel accompany his salespeople in the field to explain the special features of AC products. JDSMs and sales representatives occasionally work in other districts on special sales campaigns, called missionary work.

AC sales representatives and JDSMs do not accept payment on the orders they take, nor do they deliver the product. AC products are delivered to the warehouse distributor who pays AC. The warehouse distributor sells the product (accepts money and sends the goods) to the jobbers who in turn sell to the service stations and garages. If a sales representative takes an order from a station he sends one copy of the order form to the jobber who will then send the item to the station and collect the money. Similarly, a JDSM taking an order from a jobber would forward the order to a warehouse distributor.

When Bowen joined the sales force he was given two weeks of training in Flint, Michigan and then assigned to Cleveland. In Cleveland he received several days of training from his district manager, Leonard McCracken. Then Bowen was assigned to work with another dealer merchandiser for several days of on the job training. In November 1969, Bowen was evaluated by McCracken and was told he would have to improve his sales to calls ratio (i.e. the ratio of orders taken to calls made).

Bowen was sent on trips to Puerto Rico, Spain, and Ireland in 1969, 1970, and 1971 respectively. The overseas trips were prizes awarded for performance in incentive campaigns designed to induce warehouse distributors to carry AC products. Each district was given a goal based on sales from the prior year and the district with the greatest percentage increase won. The trips rewarded the warehouse distributors for carrying AC products, and rewarded the district managers for their sales performance. To foster future sales, district managers were accompanied by a JDSM and a sales representative from their district. Bowen was sent as the sales representative from his district. The AC men and their wives acted as hosts for the trip and met the warehouse distributors in their district.

Bowen was transferred from Cleveland to Canton in September 1970. He moved his family to Canton in November 1970. General Motors' Argonaut division will assist employees who are transferred by purchasing their home. Bowen sold his own home taking a $400 loss. Argonaut does not reimburse such losses. Bowen was reimbursed for his moving expenses.

For approximately the first four months after his transfer, Bowen was on constant assignment to jobbers. When those jobs were finished he was again working alone making calls on service stations. Bowen's performance was poor. He was not making

enough calls, and his sales to calls ratio was low. The district manager, Billy Neal Howlett, was concerned. District managers occasionally ride with their salespeople as they make their calls, and Howlett made it his practice to ride more frequently with Bowen than with the others in the district. Bowen's performance evaluations were not good, and he was not improving.

Bowen felt a great deal of pressure to improve. He took a medical leave of absence from July through September 1972. When he returned his performance was still poor. In January 1973, Bowen was told that he must get his sales to calls ratio up, and was placed on probation. Bowen then began to falsify his daily call reports and order forms.

The forms were sent to the regional office where they were tabulated. The regional manager, William Periord, had a policy of reviewing the reports of several field personnel each month. Bowen's reports were among those he reviewed in January. Periord noticed the customer signatures on Bowen's order forms looked suspiciously similar, and asked Howlett to check them. When Howlett tried to verify the orders and calls he discovered the falsification. Bowen was called to a meeting at the regional office on March 13, 1974.

In Detroit, Bowen met with Howlett and Russell McLean, a representative from the salaried personnel department of General Motors. General Motors' policy required McLean to be there because of Bowen's long tenure with the company. The meeting lasted for three to four hours. Most of the time was spent reviewing the forms Bowen had submitted. Bowen initially denied falsifying the call reports but, as Howlett went over each individual entry, Bowen finally began to admit that he had not visited the places listed. Bowen was then suspended without pay, and he was told he

would hear from the company within the week. During the subsequent week Howlett picked up Bowen's car, and at the end of the week he arranged to meet with Bowen. Howlett then told Bowen he was terminated.

Bowen falsified two kinds of reports. On the daily call reports he listed stations he had not visited. Some of the stations he listed were no longer in business; sometimes he indicated that he worked with a jobber salesman when he had not. Bowen also sent in fake orders. By tearing up two copies of the order form and sending the final copy to the regional office Bowen could take credit for the order and yet be assured that no product would be sent. (Since the jobber did not receive a copy of the order, he would not send the goods.)

Testimony established that sales representatives and JDSMs all around the country frequently took credit for orders that had already been made. Sometimes the station owner would simply call the jobber and order new stock rather than waiting to order through an AC representative. If the sales representative came around in the next day or so and learned of the recent order, he could write up the order, send one copy to the regional office and destroy the other two copies.

Bowen, as a number of the other sales people who testified, knew of the practice of taking credit for orders from his training days. The district manager typically assigned one of the other sales representatives or a JDSM from the district to train a new sales representative. Sales representatives would thus learn how to take credit for previous orders in the course of their on the job training. AC management was, however, unaware of the practice and did not condone it.[2]

2. Testimony at trial suggested that there were occasional district managers who knew about the practice, and who showed sales representatives how it was done. Nonetheless, all the sales representatives who encountered this understood that falsification was against company policy. Furthermore, apart from those few

instances, no one falsified orders on the days when his district manager was riding along with him. They understood that there was a pact not to tell about the fake orders, and recognized that the better district managers did not allow it.

Falsification of call reports was not so widespread. To falsify calls the sales representative would either put down a station that was familiar to him from prior visits, or he would take names and addresses out of the yellow pages. To keep up the sales to calls ratio, orders were sometimes reported for these fake calls. Such orders were entirely imaginary. When management found calls were being falsified the employee was discharged. When confronted with his reports at the meeting in Detroit, Bowen admitted to Howlett and McLean that the bulk of his calls for the month were falsified. The false call reports caused Bowen's termination.

Sales representative was a level 5 position, and was the entry level into the sales force. All sales people started at level 5 and based on their performance and experience they were advanced through the ranks.

JDSMs were level 6. With AC Sparkplug it took about 3 years to move from level 5 to level 6. Under AC-Delco the average time was less. With the merger the number of product lines was reduced, and the marketing emphasis shifted to the wholesaler (jobber) level. Sales representatives had an easier job to learn, and the company was also more interested in increasing the number of JDSMs contacting jobbers. Both Howlett, Bowen's zone manager, and William Periord, the regional manager, had started as sales representatives and had advanced through the successive rankings to their present positions.

A former civil rights investigator with the Michigan department of civil rights examined the personnel records of the AC-Delco sales force for the period 1970 through 1977 and tabulated the following figures:

|  | Total | Blacks | Whites | Percent black | Percent white |
|---|---|---|---|---|---|
| Persons in sales force | 893 | 70 | 823 | 7.8 | 92.2 |
| Persons promoted within sales | 538 | 17 | 521 | 3.2 | 96.8 |
| Persons who left sales force | 219 | 23 | 196 | 10.5 | 89.4 |

The figures do not reflect the number of promotions for each individual. (That is to say, if one person was promoted three times he would be counted only once.) No tabulation was made of the number of people who were discharged by the company. The persons who left the sales force may have been terminated, or they may have moved into another department at AC or into another division of General Motors; they may have retired or left voluntarily.

New sales representatives hired into AC Sparkplug were sent to Flint, Michigan for training. The representatives then returned to their assigned territory where they received on the job training. The district manager would sometimes provide part of that training himself. Otherwise, another sales person would be assigned to take the new recruit and teach him the ropes. One of the means by which district

managers supervised the sales personnel was by riding with them as they made their calls and took their orders. Typically, they would ride with each salesperson several times a year. This was often an opportunity for informal review and discussion of an employee's progress. Formal evaluations were also made periodically and discussed with the employee. If an employee performed well as a sales representative he would be advanced to JDSM; JDSMs were likewise moved up to the next level based on job performance.

Dawson Jackson was hired by AC Sparkplug as a sales representative in October 1973. In December 1976 he was promoted to JDSM. Henry Freed was promoted from a level 5 position in Detroit to a level 6 position in Fort Wayne, Indiana. Freed requested that he be returned to the level 5

position in Detroit. When Eugene T. Franklin went through the training program in Flint, he noticed room for improvement in the program. Franklin has a degree in education; he requested a position with the training staff but he was not given such a position and he left AC-Delco. Like the plaintiff, these three men were black.

All sales representatives were given special assignments when they were available: missionary work and assignments with jobbers. Contests were also run for sales people, some were regional, some national. Sales representatives could participate in some of the contests, and win prizes based on their sales performance. Sales representatives could not win trips outside the continental United States. Henry Freed was the winner in one of these contests, but the announced prize of a mink coat was later rescinded. Jason Fuller Bryant (a black male) was leading in a sales contest when it was discovered he was falsifying his reports. He was discharged.

Employees could apply for leaves of absence. Clifton Jones took a leave of absence and returned to the sales force. (As noted *supra*, Bowen did the same.) Craig Johnson took a leave of absence and was not given a position when he sought to return. The letter granting Johnson his leave clearly stated that he would be given a position only if there was a suitable one available. Jones and Johnson are black.

## DISCUSSION AND CONCLUSIONS OF LAW

A. Plaintiff's individual claim.

■ A plaintiff suing under Title VII must carry the initial burden of establishing a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff has entirely failed to sustain this burden.

Plaintiff claims defendant discriminated against him with regard to training, promotions, transfers, moving, evaluations, and discharge. Plaintiff's charge with the Equal Employment Opportunity Commis-

sion (EEOC) was timely only with respect to his discharge. Plaintiff was discharged for falsifying call reports. Plaintiff was apparently never told that it was against company policy to falsify reports but it is simply incredible that he did not know it would be grounds for discharge.

■ Plaintiff's brief argues that the falsification was simply a pretext for discharging plaintiff, as there were other black sales people who falsified some of their reports who were not discharged. To establish a claim of discrimination, however, plaintiff—a black male—must show he was treated differently than white males who were similarly situated. No evidence was introduced to show that the company retained white employees when it knew they falsified call reports.

■ Standing alone, the other alleged acts of discrimination could not be the basis for individual relief because no timely charge was filed with the EEOC. Such actions might reveal a broader pattern or practice of discrimination by the defendant, but plaintiff failed to establish these alleged acts of discrimination as well.

Plaintiff received the same training as other sales representatives. Bowen was not reimbursed for the loss on the sale of his house, but the defendant never reimburses such losses. Plaintiff was transferred to Canton to replace a sales representative who was promoted. Plaintiff tries to say the new territory was poor and that the transfer caused Bowen's performance to deteriorate. Bowen's testimony established, however, that he worked only a small fraction of the territory assigned to him. The territory was fine; Bowen's performance was poor.

Bowen's below average performance was a matter of serious concern to his district manager and did not merit a promotion. Bowen apparently thinks his evaluations were discriminatory because he was sent on overseas trips at the same time he was receiving poor performance evaluations. The Court has found that Bowen was not sent on the trips based on his performance,

therefore, the apparent inconsistency disappears. Bowen's contentions in this regard are further undercut by the fact that Bowen was familiar with the evaluations made by Howlett, yet at the meeting in Detroit Bowen told McLean several times that he had no beef with Howlett.

## B. Class Claims

The Court will, for ease of discussion, review the claims as they were pleaded in paragraph 11 of the complaint.[3]

■ Allegation b concerns transfers and promotions. Several of the black employees who testified for plaintiff had been promoted. There was no evidence showing that white employees with less experience or poorer performance were promoted over black employees. Plaintiff relies on his statistics to show discrimination in promotions. The statistics, however, do not measure promotions from the relevant pool. Only level 5 employees can be promoted to level 6; only level 6 employees can be promoted to level 7, etc. Plaintiff's figures lump together promotions between a number of different levels, occurring over a number of years. They do not accurately reflect the groups from which any promotions were made, and are therefore meaningless.

There was even less evidence adduced to show discrimination in transfers. Eugene Franklin sought a lateral transfer which was granted; Bowen's lateral transfer was company initiated. These two isolated incidents do not show discrimination.

Allegation c concerns job assignments, conditions of employment, and other practices that operate to deny Negroes equal opportunities because of their race. Job assignments were given without regard to race, and job conditions were the same for all sales personnel.

■ Allegations d and e speak generally of policies and practices that adversely affect Negroes. Plaintiff tries to argue that Negroes were treated differently with regard to moving expenses, but the credible evidence showed the company paid the moving expenses when an employee's transfer was company initiated, without regard to race. Concerning sales contests, one black employee said a prize was rescinded after he won, but that alone will not sustain a finding of discrimination. Another witness recalled dissatisfaction among black employees in the Los Angeles region, but he could recall only one specific incident: at one company meeting a man in lower management made a derogatory remark about affirmative action. These two unconnected incidents do not show discrimination by defendant.

■ Subparagraph f alleges defendant's training practices are discriminatory. Whites and blacks were in the same classes and received the same training at Flint. On the job training was primarily the responsibility of the district manager in each district. There was no comparison of the on the job training received by whites and blacks, and therefore no basis for the Court to find the training was discriminatory. Defendant did not make Eugene T. Franklin part of the training staff upon his request, but that does not show discrimination in training. Of the seven black employees who testified for plaintiff, one said he worked in the field several months before receiving training at Flint. Another witness had several weeks of training in California and received further training at Flint after a month or so in the field. These incidents of delay do not establish discrimination in training.

Bowen took a temporary medical leave of absence; when he returned to work his performance was still poor. His experience was the only one relevant to the allegations concerning medical leaves in subparagraph g and this does not show discrimination. The only allegations concerning discharge are found in subparagraph g so this must be where the plaintiff intends to apply his figures reflecting the persons who left the

---

**3.** The allegations are reproduced *supra*. Allegation a, attacking defendant's hiring policies, is no longer before the Court because only those who were hired by defendant are members of the class certified by the Court.

sales force. Those figures include persons who transferred to other departments, who retired, who quit, etc. The Court has no way of knowing what proportion of the people leaving the sales force were terminated by the defendant. Plaintiff says that persons may have quit because of discriminatory policies, and that they were in effect terminated by the defendant's discriminatory policies, but that only complicates the problem. The Court cannot speculate how many people quit; nor can it divine the number of persons who quit because of a perception of discrimination.

Because plaintiff has not established the allegations previously discussed, there can be no liability for failure to correct those practices, and plaintiff's claims under subparagraph h must fail.

Allegation i says the defendant discriminates against employees who file complaints of discrimination with state and federal agencies. There was no evidence that the defendant discriminates on that basis.

Plaintiff presented to the court a number of isolated incidents involving black employees, but failed to establish that defendant acted with any discriminatory intent. Discriminatory intent need not be proved if there were patterns or practices that had a disproportionate impact on blacks. See *Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854–1855 n.15, 52 L.Ed.2d 396 (1977). No showing of disproportionate impact was made. There were no reliable statistics presented from which the Court could determine the impact of defendant's practices on blacks and whites.

Accordingly, all plaintiff's claims fail and judgment will be entered for defendants.

IT IS SO ORDERED.